UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY MCCLENDON,

       Plaintiff,                                  Case No. 2:12-cv-230

v.                                                      HON. R. ALLAN EDGAR

PATRICIA CARUSO, et al.,

       Defendants.
_____/

**REPORT AND RECOMMENDATION**

Plaintiff Anthony McClendon, an inmate currently confined at the Ionia Correctional Facility, filed this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against several employees of the Michigan Department of Corrections (MDOC). On March 25, 2013, the court issued an opinion and order dismissing the majority of Plaintiff's claims. The remaining claims are Plaintiff's retaliation claims against Defendants Curtis, Osborn, Smith, Hall, Johnson and Lurson and his Eighth Amendment claims against Defendants Johnson and Lurson.

Plaintiff's complaint alleges that on July 17, 2009, while he was incarcerated at the Chippewa Correctional Facility (URF), he was placed on observation in segregation due to being depressed as a result of being harassed by staff at URF. On that date, Plaintiff, a practicing Buddhist, began a religious fast in order to gain spiritual insight. Plaintiff states that fasting is a significant tenet of his religious beliefs. Defendants Melissa LaPlaunt and Merling contacted Defendant Stieve and informed him that Plaintiff was not eating. Defendant Stieve labeled Plaintiff's fast as a "hunger strike," despite the fact that Plaintiff explained that he was fine physically and mentally and was exercising his protected religious beliefs. Defendant Stieve directed Defendants Merling and

Melissa LaPlaunt to get Plaintiff's vital signs and weight. Plaintiff refused to submit to having his weight and vital signs taken. Defendant McQuiggin was contacted regarding Plaintiff's fast, labeled the behavior as a "hunger strike," and ordered that Plaintiff be forced to submit to vital sign and weight checks through the use of force and chemical agents. Plaintiff asserts that Defendant Sherry approved and/or acquiesced to the use of force to obtain Plaintiff's vitals and weight. Plaintiff states that he had been labeled by medical personnel as "high risk" for chemical agents because they caused him to suffer from breathing problems, skin rashes, blurred vision, and burning skin.

On June 18, 2009, Plaintiff sought treatment for chest pains and dizziness. Defendant Eicher saw Plaintiff and asked him what he had been doing and he responded, "Push ups and pull ups." Plaintiff added that he had not eaten in two days because he was depressed. When Defendant Eicher said that Plaintiff's comment did not make sense, he asked her where she had gotten her degree in Psychiatry. Defendant Eicher then told Plaintiff to "get the fuck out." Plaintiff complained that Defendant Eicher had not provided him with any treatment and she asked if he understood what "get the fuck out" meant.

On December 17, 2009, Defendant Chris Brown ordered Plaintiff to empty his pockets and submit to a shakedown. During the shakedown, Defendant Chris Brown felt Plaintiff's genitals "for self-gratification." Plaintiff protested and stated that he was going to write a grievance. Defendant Chris Brown told Plaintiff to "cry to his mother." Plaintiff told Defendant Chris Brown that he was going to call his mother and tell her exactly what Defendant Brown had done. Plaintiff alleges that following this incident, he was transferred to the Adrian Correctional Facility, and then to the Woodland Correctional Facility (WCC) for a psych evaluation. After about six months, Plaintiff was sent back to URF without his footlocker, legal papers and typewriter.

On February 1, 2010, Plaintiff told Defendant McGeshick that he was feeling depressed and was suffering from sleeplessness, loss of appetite, and suicidal thoughts, and that he was being mentally abused by staff and neglected by health care. Plaintiff told Defendant McGeshick that he needed to be sent back to a Residential Treatment Program and that he needed to be on medication for his bi-polar condition. Because there was no psychiatrist at URF at that time, Defendant McGeshick advised Plaintiff to refuse to return to the general population until staff tired of writing him misconduct tickets for disobeying a direct order. Plaintiff stated that he was close to being paroled and could not afford to get tickets. Plaintiff asked Defendant McGeshick to put in a referral to "crisis intervention" at WCC, but Defendant McGeshick stated that he could not do that. Plaintiff further states that Defendant McGeshick is required to report the criminal sexual conduct of Defendant Chris Brown, but that he failed to do so.

On February 5, 2010, Defendant Curtis interviewed Plaintiff on his grievance against Defendant Chris Brown for touching Plaintiff's genitals. Defendant Curtis stated that he believed Plaintiff was attempting to circumvent the disciplinary process by making a false accusation against Defendant Chris Brown. Defendant Curtis asked Plaintiff if Defendant Chris Brown had written any tickets on him. Plaintiff said "no." Defendant Curtis then told Plaintiff to give him a shakedown because he wanted "some of this," and felt Plaintiff's genitals. Plaintiff told Defendant Curtis that he was going to file a grievance on him, and Defendant Curtis responded that Plaintiff should make sure and spell his name correctly.

On February 8, 2010, Defendant McGeshick told Plaintiff to attempt suicide. Plaintiff filed a grievance on Defendant McGeshick and on February 11, 2010, Defendant McGeshick placed Plaintiff on observation in segregation for 14 days. Plaintiff complained to Defendant West and attempted to talk to Defendant Hooten, to no avail. On February 19, 2010, Plaintiff told Defendant

West that he was not on a hunger strike, but that it was a religious fast. Defendant West stated that he needed to take Plaintiff's blood pressure and weight. On March 10, 2010, Defendant Brown asked Plaintiff how his "lying ass" was, and Plaintiff asserted that his name was "McLendon-El." Defendant Brown stated "I'm going to show you how to jail. You won't have to go on no religious fast to go to the hole." Plaintiff asked Defendant Brown if he was threatening him, and Defendant Brown stated that he was making a promise. Plaintiff told Defendant Brown that he'd be better off leaving him alone.

On May 10, 2010, Defendant Osborn called Plaintiff a "nigger" and said that staff were going to write Plaintiff a new ticket every day. Defendant Osborn then told Plaintiff to write a grievance on him, and told him that he would not be getting felt up, but instead would be "fucked." Plaintiff asserts that Defendants Osborn, Smith and Hall were writing tickets on him almost every day. On May 11, 2010, Defendant Smith called Plaintiff a nigger and told him that he was being harassed because he had written too many grievances on staff. On May 25, 2010, Defendant Hall called Plaintiff a "nigger" and stated that he was going to teach Plaintiff a lesson because of his grievance writing, and that he could "get" Plaintiff as long as he was at URF.

On June 16, 2010, Plaintiff asked Defendant Boswell about her failure to send Plaintiff to a treatment program, stating that his confinement in observation for more than 72 hours was causing his psychological trauma. Defendant Boswell told Plaintiff that she did not owe him anything and that if Plaintiff would "fall in line," maybe she and "these white folks" would ease up on him. On June 24, 2010, another inmate, Clemons #232413, assaulted Plaintiff while Defendants Johnson and Lurson watched for approximately three minutes. Plaintiff asked Defendants Johnson and Lurson to get prisoner Clemons off of him, but they just called Plaintiff "nigger boy" and told him to shut up. Plaintiff was then taken to segregation. Plaintiff protested that he had not even

4

thrown a punch and that the videotape would prove he was telling the truth. Plaintiff was told to be quiet.

A few days later, Plaintiff told Defendant Boswell that he had not fought back and asked if she would get Defendant McQuiggin to look at that videotape. After this visit, Plaintiff was told by staff that Defendant Boswell refused to come back and see Plaintiff. Defendant Durant looked at the tape, but still refused to release Plaintiff from segregation. Defendant West told Plaintiff that he had spoken to Plaintiff's mother and that she was worried about his health. Defendant West told Plaintiff that if he stopped fasting and chilled out for month in the general population, that Defendant McQuiggin had agreed to transfer Plaintiff to a prison closer to his family. Plaintiff told Defendant West that Defendant Boswell had already done her psych evaluation and the only thing stopping Plaintiff from going to court and beating the misconduct conviction was that it was over the time limits. Plaintiff talked to Defendant Durant several times about getting out of segregation, and Defendant Durant said he would "check into it." However, Defendant Durant never got back to Plaintiff. Plaintiff also told Defendants Derry and Batho that he was not supposed to be in segregation because he had not been fighting, which could be verified by the videotape, and that he was over the time limit for going to court on the ticket. Defendants Derry and Batho told Plaintiff that he was "shit out of luck." Defendants Derry and Batho laughed at Plaintiff each time they made rounds, which caused Plaintiff to feel suicidal and try to hang himself.

On July 2, 2010, Plaintiff covered his cell window in an attempt to get Defendant Boswell to come speak with him. However, each time Plaintiff asked for Defendant Boswell, staff told him to be quiet and lie down. Plaintiff states that a prisoner a few cells down from him was gassed, which caused Plaintiff to suffer from burning skin, burning eyes, trouble breathing, and an intense fear of death. Staff subsequently came to Plaintiff's cell and told him that he had been

5

released from segregation. A female guard told Plaintiff that he was being taken to level 4, round unit. Plaintiff responded that he was not a level 4 prisoner and that prisoner Clemons, the prisoner who had assaulted Plaintiff, was in round unit. Plaintiff then stated that he was feeling suicidal and Defendant Dragan wrote a ticket on him for disobeying a direct order (DDO). Plaintiff tried to hang himself. When Defendant Burl came to review the DDO ticket with Plaintiff, he told Plaintiff to chill out, that he was going to level II on Monday. Plaintiff seeks damages.

Presently before the Court is the Motion for Summary Judgment filed by Defendants Curtis, Hall, Johnson, Lurson, Osborn, and Smith pursuant to Fed. R. Civ. P. 56. Plaintiff has filed a response and the matter is ready for decision. Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007).

A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Defendants claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain

the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original). The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶ X.

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. *Id.* at ¶¶ T, DD. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a

8

medical care grievances. *Id.* at ¶ GG. If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id.* at ¶ X. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall be completed within 90 calendar days unless an extension has been approved . . . ." *Id.* at ¶ HH.

Defendants attach a copy of the Step III Grievance Report for Plaintiff, which shows that he filed nine grievances to step III in 2010, the year that Defendants engaged in the alleged misconduct. *See* Defendants' Exhibit B. Defendants attach copies of grievance numbers URF-10-04-1417-12b, URF-10-06-2399-12b, and URF-10-04-1454-12z, which assert that Plaintiff was transferred without an appropriate mental health evaluation, that he was denied mental health services, and that he was forced to undergo a healthcare evaluation during a hunger strike. *See* Defendants' Exhibits C, D, and E. As noted by Defendants, the assertions set forth in these grievances do not relate to the allegations in Plaintiff's complaint. Therefore, they do not serve to exhaust the claims in Plaintiff's complaint.

In addition, grievance numbers URF-10-05-1811-28b, URF-10-05-1858-28z, and URF-10-02-0500-12b concern allegations that the MDOC continues to collect restitution money from discharged inmates, and that Plaintiff did not receive appropriate mental health services. *See* Defendants' Exhibits J, K, and L. As noted by Defendants, the assertions set forth in these

grievances do not relate to the allegations in Plaintiff's complaint. Therefore, they do not serve to exhaust the claims in Plaintiff's complaint.

In grievance number URF-10-02-0486-17b, Plaintiff complained that Defendant Curtis had tried to intimidate him into signing off on a grievance involving Defendant Brown. However, as noted by Defendants, Plaintiff's step II appeal was rejected as untimely. *See* Defendants' Exhibit F. In the step III appeal, the respondent stated: "The Step II appeal was rejected due to time limits. As there is no additional information or basis found for relief at Step III, the Step I decision is upheld." *Id.* at p. 2 of 7.

In interpreting the PLRA, it is appropriate to look to the substantively similar exhaustion rules applicable in habeas cases for guidance. *Woodford*, 548 U.S. at 88. In the habeas corpus context, a petitioner is required to properly present his federal claims through one complete round of the State's established appellate review process. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). "To 'protect the integrity' of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies . . ." *Id.* at 848 (citation omitted; emphasis in original). In habeas, the sanction for failing to exhaust properly (preclusion of federal review) is called procedural default. *Woodford*, 548 U.S. at 93. To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003).

Under the procedural default component of § 1997e(a), an inmate's claims are procedurally defaulted if he fails to complete the administrative review process in accordance with the deadlines and other applicable procedural rules and prison officials in the last level of review actually relied upon the procedural rule to bar review of the grievance. *See Reed-Bey v. Pramstaller*, No. 08-1774, slip op. at 4 (6th Cir. Apr. 28, 2010); *Johnson v. Meadows*, 418 F.3d 1152, 1159 (11th Cir. 2005), *cert. denied*, 126 S. Ct. 2978 (2006); *Spruill v. Gillis*, 372 F.3d 218, 222 (3rd Cir. 2004) (holding that "the determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations.") Moreover, just as procedural default in the federal habeas corpus context must be predicated on an adequate and independent state ground, the procedural requirements of a prison grievance system may not be imposed in a way that offends the Federal Constitution or the intended purposes of § 1997e(a). *See Spruill*, 372 F.3d at 232.

As noted above, Plaintiff filed his appeal to Step II more than five days after receiving the Step I response to his grievance, in violation of PD 03.02.130, ¶¶ U, DD. As a consequence, Defendants contend that the grievance was untimely and Plaintiff failed to "properly exhaust" his grievance within the meaning of PD 03.02.130, in violation of the Supreme Court's decisions in *Woodford*, 548 U.S. at 90, and *Jones*, 127 S. Ct. at 922.

In *Woodford*, the Supreme Court held that the exhaustion requirement was not satisfied when grievances were dismissed because prisoners had missed deadlines set by the grievance policy. 548 U.S. at 90. In this case, prison officials rejected Plaintiff's step II appeal as untimely and did not address the merits of Plaintiff's grievance. Nor were the merits addressed in Plaintiff's step III appeal. Therefore, grievance URF-10-02-0486-17b fails to exhaust Plaintiff's administrative remedies as to his claims against Defendant Curtis.

In grievance URF-10-05-2062-17a, Plaintiff complained that Defendant Hall called him a "nigger" and threatened to retaliate against Plaintiff for writing a grievance on him. *See* Defendants' Exhibit H. A review of the record shows that Plaintiff's step II appeal of this grievance was rejected as untimely, in the same manner as URF-10-02-0486-17b. *Id.* Therefore, the undersigned concludes that URF-10-05-2062-17a does not exhaust Plaintiff's administrative remedies against Defendant Hall.

In grievance URF-10-05-1908-17a, Plaintiff complained that Defendants Hall and Smith, and Assistant Resident Unit Supervisor Beaulieu made inappropriate racial slurs and physical threats to Plaintiff in retaliation for his use of the grievance process. *See* Defendants' Exhibit I. However, as with grievance numbers URF-10-02-0486-17b and URF-10-05-2062-17a, Plaintiff's step II appeal in URF-10-05-1908-17a was rejected as untimely. Therefore, the undersigned concludes that URF-10-05-1908-17a does not exhaust Plaintiff's administrative remedies against Defendants Hall and Smith.

In response to Defendants' assertions regarding the untimeliness of Plaintiff's step II appeals, Plaintiff states that his step II appeals were late because he was on observation for 39 days. However, Plaintiff fails to specify the dates that he was on observation or to explain why being on observation prevented him from filing timely step II appeals.

Plaintiff also states that Defendants failed to authenticate the documents offered in support of their motion for summary judgment. The Sixth Circuit "has repeatedly emphasized that 'unauthenticated documents do not meet the requirements of Rule 56(e).'" *Automotive Support Group, LLC v. Hightower,* 503 Fed.Appx. 411, 418 (6th Cir. 2012) (citing *Alexander v. CareSource,* 576 F.3d 551, 558 (6th Cir. 2009) (listing cases)). Therefore, the undersigned concludes that Defendants' motion for summary judgment may not be granted. Accordingly, the undersigned will

recommend that the motion be denied without prejudice to Defendants' ability to provide the court with proper authentication for the documents in support of their motion for summary judgment. Should Defendants provide the court with such authentication during the time for filing objections, the undersigned recommends that the motion for summary judgment be granted.

For the foregoing reasons, I recommend that Defendants' motion for summary judgment (docket #26) be denied.

/s/ Timothy P. Greeley
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated: February 19, 2014

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).